# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**ESTIMÉ FRANÇOIS and**
**RENETTE ORDEUS,**
**on behalf of themselves and**
**all others similarly situated,**

> **Plaintiff,**

**vs.**                                        **Case No.: 8:16-cv-01061-SCB-TBM**

**GULF COAST TRANSPORTATION, INC.,**

> **Defendant.**

_____/

## DEFENDANT'S MOTION TO DISMISS
## PLAINTIFFS' FIRST AMENDED COMPLAINT

The Defendant, Gulf Coast Transportation, Inc. ("Gulf Coast") moves pursuant to Rule 12(b) of the Federal Rules of Civil Procedure to dismiss the three counts of the first amended complaint ("Complaint") filed by the Plaintiffs, Estimé François and Renette Ordeus, for the Complaint's failure to state any claim upon which relief may be granted. In support of this Motion Gulf Coast files the following memorandum.

## MEMORANDUM OF LAW

The Plaintiffs have filed a three-count complaint against the Defendant alleging violations of: (1) the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* ("FLSA"), by the Defendant having failed to pay the Plaintiffs the statutory minimum wage required by law (Count I); and (2) the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") (Count

III(1);[1] and (3) the Defendant Francois sues for conversion of the bond which the Plaintiffs were required to post as a condition of the "'lease' agreement" or "'lease agreement' scheme" to which the Plaintiffs allege they were parties (Count III). The Plaintiffs allege class status for Counts I and the first Count III.

The counts brought pursuant to the FLSA and FDUTPA arise out of what is the Plaintiffs' central contention, that they were treated as independent contractors although they were in fact employees within the meaning of the FLSA. Thus the Plaintiffs allege that they were cheated out of minimum wages to which they were due by law and that the Defendant knowingly misclassified them as independent contractors.

In fact the Defendant never employed the Plaintiffs, and the contractual undertaking between the parties does not allow a finding of that status. Both of the Plaintiffs entered into a contract with the Defendants entitled "Agreement for Independent Vehicle-For-Hire Operations" ("Agreement"). A copy of that Agreement, signed by Francois on June 22, 2015, is attached to this Motion as Exhibit "1." Although the Plaintiffs allege a "'lease' agreement" and purport to attach it as an exhibit, they do not do so. They do, however, cite many of the provisions in that agreement without specific attribution in the general allegations of the Complaint and those references make clear that the "lease agreement" is in fact the Agreement. (Dkt. 6, ¶¶ 72-75, 78-81). The Agreement is at the heart of all of the claims brought by the Plaintiffs because it describes and defines the relationship between them and the Defendant. For those reasons it is properly considered as part of the Complaint and must be assessed as a part of it. *Day v. Taylor*, 400 F.3d 1272, 1275 (11th Cir. 2005).

---

[1] The Complaint includes no Count II but two "Count IIIs." To differentiate between each Count III, the first will be referred to as "Count III(1)," the second as "Count III(2)."

The Agreement, which is the only contractual relationship which exists or ever existed between the Plaintiffs and the Defendant, is patently not a contract of employment. There does not exist, and never has there been, an employment relationship between the parties. The parties never sought such a relationship. The Defendant never agreed to pay the Plaintiffs any compensation, never contracted for the Plaintiff to perform services for it and never was the Plaintiff's employer.

The Plaintiffs are careful in their pleading. They allege the legal conclusion that they are "employees" under the FLSA. (Dkt. 6, ¶ 16). And they plead some facts which are intended to support that conclusion. In paragraphs 36 and 37 of the Complaint, the Plaintiffs allege that they began "working for Defendant as a taxicab driver." But those facts do not state a plausible claim for relief based on their status as an employee within the meaning of the FLSA. In fact, under current and established decisional law, the allegations support the contrary conclusion, i.e., that the Plaintiffs and all others who signed the Agreement are not entitled to claim that status.

The Plaintiffs both signed agreements by which the Defendant made available for purchase:

> [i]ts services described herein, and INDEPENDENT CONTRACTOR desires to hire [the Defendant] to provide same, which shall include furnishing INDEPENDENT CONTRACTOR the service and equipment selected by INDEPENDENT CONTRACTOR on Schedule "A" attached which may be utilized to aid INDEPENDENT CONTRACTOR's business of transporting passengers[.]

Schedule "A" includes a vehicle, outfitted with all equipment necessary to the lawful operation of a taxicab in Hillsborough County Florida, including a two-way radio, taxi meter, tablet, and cables, which may be used for a 12 or 24-hour, or weekly, term. The Agreement

also provides that the Defendant will make available services procured by it (including the right to pick up passengers at Tampa International Airport, but only if the contractor purchases an additional permit) and is willing to provide, install, and maintain necessary equipment to enable the contractor to access the Defendant's radio communications system. There is nothing in the contract which provides for the payment of wages or other remuneration, nothing which would constitute a misrepresentation of the kind alleged in the Complaint and nothing which would allow the Defendant to control the means by which the Plaintiffs plied their business as the operators of taxicabs.

The Agreement is the kind of contract which courts have found to create lawful independent-contractor relationships in the taxicab industry, an assertion which is proven by review of the extensive body of law which has been decided in the specific context of taxicabs' business. The Plaintiff Francois alleges that he began "working as a taxicab driver in 2009." (Dkt. 6, 36). In fact, the Agreement between the Defendant and the Plaintiff Francois is dated June 22, 2015. (Motion, Exhibit "1"). The Plaintiff Ordeus alleges that she worked from August of 2015 until February of 2016. (Dkt. 6, ¶¶ 37, 38). She is included in the allegations relating to the "lease agreement" pled in paragraphs 72-75 of the Complaint (Dkt. 6). The Plaintiffs allege much about the equipment contained in the taxicabs that are the subject of the Agreements. The Agreement speaks to that equipment. The Plaintiffs allege that they are required to stand and wait at Tampa International Airport. In fact they are not required to do so.[2] The Agreement does not require any driver to wait at the Airport if he or

---

[2] The Agreement, in the sixth "Whereas" clause on page 1 of the Agreement (Exhibit "1" to this Motion) provides that the Defendant is willing to share "any of the privileges which it has secured for picking up passengers at Tampa International Airport, as long as INDEPENDENT CONTRACTOR has procured the TIA required "HANG TAG", driver permit."

she chooses not to. In fact, the Agreement makes no claim to restrict or control the movement, or schedule, of those who sign Agreements to purchase services including use of the taxis.

The Plaintiffs allege requirements imposed on taxicabs to pick up fares, accept credit cards, use a meter and to operate in a specified manner. These requirements are imposed by the government regulators of all taxicab drivers in Hillsborough County. The Plaintiffs provide a laundry list of factors, which must be taken as true here in an effort to subvert the reality that what the Plaintiffs seek is a determination that in the environment of enhanced enforcement of the FLSA by the Department of Labor, the Court will disregard what is prevailing and controlling law, and find employment status where it does not exist. The effort cannot succeed. That law has not changed as of the time of the filing of this Motion and whatever the Department of Labor may intend, the time to fulfill those intentions is not yet at hand.

## I.   STANDARD OF REVIEW

In considering a motion to dismiss under Rule 12(b)(6), a court must accept the factual allegations of the complaint as true and evaluate all inferences derived from those facts in the light most favorable to the plaintiff. See Erickson v. Pardus, 551 U.S. 89, 94 (2007). However, conclusory allegations, unwarranted factual deductions, or legal conclusions masquerading as facts are not entitled to the assumption of truth. See Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009); Davila v. Delta Air Lines, Inc., 326 F.3d 1183, 1185 (11th Cir.2003). The allegations must "state a claim for relief that is plausible on its face" or, in other words, that "allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged." <u>Hunt v. Aimco Properties, L.P.</u>, 814 F.3d 1213, 1221 (11th Cir. 2016) (quoting <u>Iqbal</u>, 556 U.S. at 678; <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007)). The Complaint is in fact not plausible, because all of the alleged indicia of employee status in the Complaint have been found not to require a finding that the Plaintiffs are employees.

## II.   FACTS

In order to operate a taxicab in Hillsborough County, a driver must purchase, at his or her own expense, a license. (Dkt. 6, ¶ 66). From "2009" until "on or about January 14, 2016," Francois worked as a licensed taxicab driver. (Dkt. 6 ¶¶ 36, 66, 67). Ordeus worked from "August of 2015" until "on or February [sic] of 2016." (Dkt. 6 ¶¶ 37, 66, 67). Each, in the course of his or her business (and at the same time acting as "consumers") (Dkt. 6 ¶ 19), leased vehicles and related services from Gulf Coast for a twelve-hour, twenty-four-hour, or weekly term. (Dkt. 6 ¶¶ 74, 75). In this arrangement, each Plaintiff kept for him- or herself all the fares and tips received from passengers. (Dkt. 6 ¶ 78). Gulf Coast's sole sources of revenue were (1) the drivers' lease payments, (Dkt. 6 ¶¶ 78, 85), and (2) the compensation derived from placing advertisements on the cabs. ( Dkt. 6 ¶ 109). Gulf Coast classified the Plaintiffs and the other lessees as independent contractors and accordingly paid them no wages. (Dkt. 6 ¶ 114).

According to the Complaint, "Gulf Coast [wa]s in the business of providing taxicab services within and from Hillsborough County, Florida." (Dkt. 6 ¶ 41). Specifically, as mentioned above, Gulf Coast leased cabs and a host of related services to professional taxi drivers on a twelve-hour, twenty-four-hour, or weekly basis. (Dkt. 6 ¶¶ 74, 75). In exchange,

each driver posted a refundable bond of between $1,000 to $2,000, (Dkt. 6 ¶ 73), and paid a fee of $86, $98, or $650 depending on whether he or she leased a cab for twelve hours, twenty-four hours, or a week, respectively. (Dkt. 6 ¶¶ 74, 75). As part of this arrangement, the company garaged, serviced, and maintained its fleet of taxicabs. (Dkt. 6 ¶ 52). It also provided roadside assistance and wrecker service to drivers whose taxicabs experienced mechanical problems. (Dkt. 6 ¶ 48). In addition, it negotiated permission for its drivers to pick up passengers from places like the Tampa International Airport (Dkt. 6 ¶ 61, 62), outfitted its cabs with "VeriFone point-of-sale payment verification software," (Dkt. 6 ¶ 22(b)), and collected and processed passengers' credit card payments for the benefit of the drivers. (Dkt. 6 ¶ 59). Gulf Coast outfitted each cab with a laptop and GPS, (Dkt. 6 ¶¶ 56, 22(b))), and offered but did not require training to new drivers. (Dkt. 6 ¶ 53).

As indicated above, Gulf Coast earned revenue only through the drivers' lease payments and by posting advertisement on its cabs. Drivers kept all fares and tips, and they were free to offer rides to anyone who hailed their cabs. (Dkt. 6 ¶ 27). Each driver was responsible for keeping his or her car fueled. (Dkt. 6 ¶ 22(c), 79).

The Hillsborough County taxicab industry is heavily regulated by the Hillsborough County Public Transportation Commission ("Commission") Rules ("PTC Rules") under the authority of Chapter 2001-299, Laws of Florida. Available at http://www.hillsboroughcounty.org/index.aspx?NID=2729 (then click hyperlink labeled "PTC Rules"). In fact, much of the requirements about which the Plaintiffs complain—such as the inability to refuse a ride to any passenger able and willing to pay—are mandated by the Commission, not Gulf Coast. As an initial matter, no one may operate or lease taxicabs in

Hillsborough County without first applying for a "Certificate" to do so, which involves a $1,000 application fee and a presentation before the Commission at a public hearing. PTC Rules 1-2.001(1), 1-17.001(1)(a). "Certificate Holders" must then apply for one "Permit" per taxicab. PTC Rules 1-2.001(6), 1-3.001(2). Each Permit application costs $500, and Permits are auctioned off to the highest bidder. PTC Rules 1-2.001(7)(b), 1-17.001(1)(a). "The Commission may at no time authorize more than one (1) Taxicab Type of service Permit per each one thousand-nine hundred (1,900) inhabitants of Hillsborough County according to the most recent official estimate . . . ." PTC Rule 1-2.001(7). Once all permits under that cap have been issued, "no additional applications . . . will be accepted . . . ." until the population grows sufficiently. PTC Rule 1-2.001(7)(a). At all times relevant, Gulf Coast was a Certificate Holder. (Dkt. 6 ¶ 51). Allegedly, "[a]t various times during the past fifteen years, [Gulf Coast] has publically advocated for stringent limits on the issuance of taxi permits by the [Commission]," (Dkt. 6 ¶ 70), and "the [Commission] has issued few new taxi permits." (Dkt. 6 ¶ 71). The Plaintiffs complain that due to the "stringent requirements and costs associated with this process [of obtaining a Certificate and Permits], along with the extremely limited number of available taxi permits in Hillsborough County," it is "nearly impossible for an individual taxicab driver to obtain a permit that is valid in Hillsborough County." (Dkt. 6 ¶¶ 68, 69). But the regulations are not an onus imposed by the Defendant. They are a burden which rests on anybody seeking to operate a taxicab in Hillsborough County.

In any event, Gulf Coast, as a Certificate Holder, had a legal duty to comply with the PTC rules. Pursuant to this duty, Gulf Coast set forth a grooming policy, (Dkt. 6 ¶ 2), PTC Rules 1-6.001(6), required drivers to keep their cabs clean, (Dkt. 6 ¶ 96), PTC Rule

1-8.001(1)(d), prohibited drivers, when unavailable to work, from hiring an assistant to drive in their stead,[3] (Dkt. 6 ¶ 102), PTC Rule 1-6.001(19), required drivers to accept credit cards as a form of payment,[4] (Dkt. 6 ¶ 28), PTC Rule 1-6.001(8), forbade drivers from refusing a ride to any passenger willing and able to pay,[5] (Dkt. 6 ¶¶ 28, 98, 99), PTC Rules 1-6.001(2), 1-7.001(4), and prevented drivers from placing their own advertisements on the cabs they leased, (Dkt. 6 ¶¶ 108-111), PTC Rules 1-8.001(1)(q) (setting forth the requirements for coloration and text on taxicabs), 1-7.001(10) (prohibiting drivers from advertising in any name but "the name to which the Certificate ha[d] been issued by the Commission").

As required by the PTC Rules, Gulf Coast (1) operated its business twenty-four hours a day, seven days a week, (Dkt. 6 ¶ 42), PTC Rule 1-7.001(13), (2) purchased basic insurance for its cabs, (Dkt. 6 ¶ 97), PTC Rule 1-4.001(1), (3) operated a dispatch service and equipped cabs with "two-way radios for dispatch communications," (Dkt. 6 ¶¶ 22(b), 43); PTC Rule 1-8.001(1)(b), and (3) furnished cabs with "fare meter[s]," also known as "Taximeters," programmed to charge passengers a uniform rate set by the Commission. (Dkt. 6 ¶¶ 54, 55), PTC Rules 1-6.001(5), 1-8.001(1)(b), 1-10.001(1) (requiring installation of taximeters in each cab); PTC Rules 1-6.001(8), 1-9.001(1) (requiring all Taximeters to be set to the uniform rate); PTC Rule 1-20.001 (establishing the rate).

Gulf Coast and each of its drivers understood their relationship to be that of lessor and lessee. (Dkt. 6 ¶ 114). This accorded with the PTC Rules, which generally refer to

---

[3] But two drivers may split a lease. (Dkt. 6, ¶¶ 75-76).
[4] The Defendant installed the technology to allow the drivers to comply with this requirement. (Exhibit "1," p. 5, Schedule "A," p. 3B).
[5] The Plaintiff Francois complains about the Defendant's "no-ride-refusal policy." (Dkt. 6, ¶ 98). In fact, the policy is imposed by the County, not the Defendant and all operators of taxicabs must abide by the rule. (Dkt. 6, ¶¶ 98-100).

taxicab drivers as "representatives or independent contractors," not employees, of "Certificate Holders." See, e.g., PTC Rules 1-7.001(10), (12). Accordingly, Gulf Coast did not track its drivers' profits, (Dkt. 6 ¶ 82), or hours worked, (Dkt. 6 ¶ 92), or include drivers' incomes in its gross receipts. (Dkt. 6 ¶ 83). In addition, it did not withhold or pay employment taxes, (Dkt. 6 ¶ 115), or provide workers compensation coverage. (Dkt. 6 ¶ 14(b)).

The Plaintiffs characterize themselves as "consumers" of Gulf Coast's services, (Dkt. 6 ¶ 156), but nevertheless argue they were employees of Gulf Coast, not independent contractors. (Dkt. 6 ¶ 119). They claim Gulf Coast's purported misclassification of them constituted a "willful" violation of the FLSA. (Dkt. 6 ¶ 119). According to the Plaintiffs, Gulf Coast knew it was violating the law and did so to save money and secure a competitive advantage. (Dkt. 6 ¶ 116, 117). They allege that Gulf Coast "control[led]" them (1) by charging a high lease payment, (Dkt. 6 ¶ 94), (2) by retaining the right to "uniformly increase lease payments by drivers at any time without notice," (Dkt. 6 ¶ 106), and (3) by cancelling their contracts after "more than two weeks of nonpayment." (Dkt. 6 ¶ 104). The Plaintiffs also claim Gulf Coast dictated the manner of their work through reprimands and fines, (Dkt. 6 ¶ 113), but do not explain how or allege facts which would put the Defendant on notice that it was an employer of employees.

They also contend that Gulf Coast set their work schedules, (Dkt. 6 ¶ 26), but they allege no facts in support of this conclusion. To the contrary, they state that drivers could elect to lease cabs on a twelve-hour, twenty-four-hour, or weekly basis. (Dkt. 6 ¶¶ 74, 75). Similarly, they complain that they had no time to pursue other business opportunities, but

offer no plausible explanation for how that can be when they were under no obligation to lease a taxicab for any specific number of days or weeks, or on any given day. (Dkt. 6 ¶ 25). Indeed, the Plaintiffs complain that two drivers may split a shift, with each having the use of the automobile for twelve hours (Dkt. 6, ¶¶ 74, 75), arguing that the cost of the rental, during which the cab can be kept running the entire lease period, is too high, while at the same time complaining that if they are hurt or sick they are not allowed to hire an assistant. (Dkt. 6, 75-78).

The Plaintiffs allege that they are only allowed to "retain the cash fares they receive from customers, along with tips." (Dkt. 6, 78). But as the Agreement makes clear and they concede in the Complaint, payments made by credit card facilitated by equipment provided pursuant to the Agreement and processed by the Defendant as part of the services it provides are applied to the lease payment owed to the Defendant and then everything else is credited to the drivers. (Exhibit "1"; Dkt. 6, ¶ 81). It ultimately keeps nothing from the receipts earned by the driver. It charges only the lease payment.

The Plaintiffs further argue that Gulf Coast's purportedly "willful" violation of the FLSA automatically constituted a violation of FDUPTA. (Dkt. 6 ¶ 157). They argue that "[t]he actions of Defendant, in misclassifying Named Plaintiffs and all members of the FDUPTA Putative Class as independent contractors, are unfair and deceptive trade practices prohibited under Florida law." (Dkt. 6 ¶ 159). But the Defendant classified no one. The Agreement (Exhibit "'1") identified the Plaintiffs as independent contractors and contains the statement that the driver is "an independent business."

Finally, Francois individually alleges conversion under Florida common law. He

states that, pursuant to his lease agreement with Gulf Coast, he was "required to post a bond with Defendant in the amount of $1500." (Dkt. 6 ¶ 168). He contends that after "[he] informed Gulf Coast that he would no longer be working for Gulf Coast as a taxicab driver" (Dkt. 6 pp 170) and "requested return of his bond in writing,"  (Dkt. 6 ¶ 169), Gulf Coast "knowingly fail[ed] to return [it] within thirty days . . . ." (Dkt. 6 ¶ 174).

> **A.     The Plaintiffs were independent contractors of Gulf Coast.**

"To determine whether an individual falls into the category of covered employee or exempted independent contractor, courts look to the economic reality of the relationship between the alleged employee and alleged employer" and assess whether the employer "control[s] the relationship in much the same way a company would control its employees." Scantland v. Jeffry Knight, Inc., 721 F.3d 1308, 1311-12, 1319 (11th Cir. 2013) (internal citations and quotation marks omitted). The issue of whether taxicab drivers are employees has been extensively litigated through the years.[6] The end result is that, as a matter of law in the Eleventh Circuit and elsewhere, taxicab drivers are deemed independent contractors in situations where—as in the instant case—the drivers exercise discretion in their day-to-day movements and generally "pay[] a fixed rental, regardless of [their] earnings on a particular day, and . . . retain[] all the fares [t]he[y] collect[]. . . ." Local 777, Democratic Union Org. Comm., Seafarers Int'l Union of N. Am., AFL-CIO v. N. L. R. B., 603 F.2d 862, 879 (D.C. Cir. 1978), opinion adhered to on denial of reh'g, (D.C. Cir. June 20, 1979) (denying enforcement of NLRB decision that taxicab drivers were employees under the NLRA)

---

[6] The issue of taxicab drivers' employment/contractor status involves other laws besides the FLSA including the National Labor Relations Act, the Internal Revenue Act, state workers compensation and unemployment laws, all of which have been the subject of many decisions and administrative determinations.

(quoted by <u>N.L.R.B. v. Associated Diamond Cabs, Inc.</u>, 702 F.2d 912 (11th Cir. 1983) (same));[7] <u>see also</u> <u>Sida of Hawaii, Inc. v. N.L.R.B.</u>, 512 F.2d 354 (9th Cir. 1975) (same); <u>Air Transit, Inc. v. N.L.R.B.</u>, 679 F.2d 1095 (4th Cir. 1982) (same); <u>Yellow Taxi Co. of Minneapolis v. N.L.R.B.</u>, 721 F.2d 366 (D.C. Cir. 1983) (same); <u>Arena v. Delux Transp. Servs., Inc.</u>, 3 F. Supp. 3d 1, 3 (E.D.N.Y. 2014) (holding taxicab driver was independent contractor under FLSA) (citing <u>Associated Diamond Cabs.</u>, 702 F.2d 912). Conversely, taxicab drivers have been deemed employees only when the cab company "micromanage[s]" the drivers and/or collects a percentage of their fares. As the NLRB explains,

> A flat fee is evidence of an independent contractor relationship because it places on the drivers a strong incentive to maximize their trips, since, once the flat fee is recouped, income is largely profit. In addition, a flat fee insulates a company from variations in income because regardless of the drivers' earnings the company receives the same amount from the drivers.

<u>Elite Limousine Plus, Inc.</u>, 324 NLRB 992, 1004 (1997) (affirming Regional Director's decision that limousine drivers were employees because, among other reasons, the employer retained 17 to 20 percent of the fares the drivers received, and "the Employer . . . essentially micromanaged the drivers on issues that d[id] not involve government regulations and . . . imposed a detailed and severe system of sanctions to enforce the rules it wants the drivers to follow," which involved potential termination where "the driver played ethnic or religious music, engaged in personal conversations, or forgot to ask the passenger for a preferred radio station or route.").

---

[7] The Supreme Court and Eleventh Circuit have held that decisions as to whether plaintiffs are employees or independent contractors under the NLRA, such as <u>Associated Diamond</u>, are persuasive in FLSA cases because, among other reasons, "[t]he Fair Labor Standards Act of 1938 . . . is a part of the social legislation of the 1930's of the same general character as the National Labor Relations Act of July 5, 1935 . . . and the Social Security Act of August 14, 1935 . . . ." <u>Rutherford Food Corp. v. McComb</u>, 331 U.S. 722, 723 (1947) (quoted by <u>Hodgson v. Griffin & Brand of McAllen, Inc.</u>, 471 F.2d 235, 237 n.1 (5th Cir. 1973)).

Turning to the instant case, the facts pled in the Complaint compel the determination that the Plaintiffs were independent contractors, despite the Plaintiffs' conclusion to the contrary. Indeed, the Complaint admits and incorporates by reference the Plaintiff's Agreement with Gulf Coast, which demonstrates the point. The Eleventh Circuit opinion of Associated Diamond Cabs, Inc. presents the issue aptly, setting forth the factors that define the status of taxicab drivers. 702 F.2d 912 (11th Cir. 1983). The Court there found facts very similar to the following allegations in the instant case "strongly indicate[d] independent contractor status": (1) the lease fees collected by Gulf Coast were unrelated to the profits earned by the drivers, (Dkt. 6 ¶¶ 78-80); Associated Diamond, 702 F.2d at 924, (2) the lease payments constituted an investment of several thousand dollars over the course of a year, (Dkt. 6 ¶ 74); Associated Diamond, 702 F.2d at 924, (3) the parties' lease agreement explicitly stated the drivers were independent contractors, (Dkt. 6 ¶ 114); Associated Diamond, 702 F.2d at 924, 924 n.3, (4) Gulf Coast deducted no Social Security or income taxes from the lessee's receipts, (Dkt. 6 ¶¶ 14(b), 115); Associated Diamond, 702 F.2d at 924, 924 n.3, and, (5) generally speaking, the only "control" Gulf Coast exercised over the drivers' schedules was that it required drivers to lease cabs in twelve-hour, twenty-four-hour, or weekly increments. (Dkt. 6 ¶¶ 74, 75); Associated Diamond, 702 F.2d at 921. Any other indicia of control "[were] indicative only of relative bargaining power, not an employee-employer relationship," Associated Diamond Cabs, 702 F.2d at 921.

In the case at bar, the remaining requirements imposed on the drivers—e.g., that they had to be well groomed, accept credit cards, and could not refuse a ride to any person able and willing to pay, etc.—were ultimately imposed by the PTC Rules, not Gulf Coast policy,

so such requirements are irrelevant to the issue of whether the Plaintiffs were employees. Associated Diamond Cabs at 922 ("Consistently the courts have held that regulation imposed by governmental authorities does not evidence control by the employer."). In particular, the Plaintiffs' assertion that the PTC Rules made it "nearly impossible for an individual taxicab driver to obtain a permit that is valid in Hillsborough County" reflects a restriction imposed by law, not by Gulf Coast. (Dkt. 6 ¶¶ 68, 69).

Indeed, many of the requirements imposed by the PTC Rules are irrelevant for additional reasons, as well. For example, the fact that the drivers were supposedly prohibited "from hiring an assistant to drive for them," (Dkt. 6 ¶ 102), PTC Rule 1-6.001(19), does not suggest an employment relationship because it is simply "a reasonable method for a party to ensure that he is contractually bound only to persons with whom he has a direct relationship." Associated Diamond Cabs, 702 F.2d at 920, 921. In addition, the fact that Gulf Coast controls the advertising on its cabs, (Dkt. 6 ¶¶ 108-111), PTC Rules 1-8.001(1)(q), 1-7.001(10), merely "buttresses the uncontested conclusion that [Gulf Coast], not the driver, owns the taxicab and the advertising thereon." Associated Diamond Cabs, 702 F.2d at 921.

Finally, the Plaintiffs allege that "the work performed by the . . . Plaintiffs . . . was integral to [Gulf Coast's] business . . . .," (Dkt. 6 ¶ 29), but this conclusion is not supported by any factual allegations. In fact, other taxicab-related FLSA cases have reached the opposite conclusion because "when [a driver] d[oes] not show up to drive, or d[oes] not take a dispatched call, other drivers step[] in to take those fares and transport those passengers." See Arena v. Delux Transp. Servs., Inc., 3 F. Supp. 3d 1, 13 (E.D.N.Y. 2014). In any event, even if each Plaintiff were "integral" to Gulf Coast's business, it would prove nothing

because "[tha]t is also true in many relationships which are undisputedly that of a company to independent contractors." Associated Diamond Cabs, 702 F.2d at 924.

It is also noteworthy that the Plaintiffs are not entitled to benefits under Florida's Workers Compensation program, which excludes from the definition of "employee" any

> taxicab . . . or other passenger vehicle-for-hire driver who operates said vehicles pursuant to a written agreement with a company which provides any dispatch, marketing, insurance, communications, or other services under which the driver and any fees or charges paid by the driver to the company for such services are not conditioned upon, or expressed as a proportion of, fare revenues.

Fla. Stat. § 440.02(10) (2016).[8] In sum, there is no legal or factual basis on which to find that the taxicab drivers were employees.

**B.      The Plaintiffs do not state a claim for violation of FDUTPA.**

In Count II, the Plaintiffs allege that Gulf Coast violated FDUTPA by intentionally and deceptively misclassifying the drivers as independent contractors. This claim fails for several reasons, discussed below and it is especially notable here that the Plaintiffs expressly allege themselves to be "consumers," within the meaning of FDUTPA. (Dkt. 6, ¶ 19).

---

[8] This comports with the general provisions of the statute, which state that an individual is
> presumed to be an independent contractor and not an employee based on full consideration of the nature of the individual situation with regard to satisfying any of the following conditions:
> (I) The independent contractor performs or agrees to perform specific services or work for a specific amount of money and controls the means of performing the services or work.
> (II) The independent contractor incurs the principal expenses related to the service or work that he or she performs or agrees to perform.
> (III) The independent contractor is responsible for the satisfactory completion of the work or services that he or she performs or agrees to perform.
> (IV) The independent contractor receives compensation for work or services performed for a commission or on a per-job basis and not on any other basis.
> (V) The independent contractor may realize a profit or suffer a loss in connection with performing work or services.
> (VI) The independent contractor has continuing or recurring business liabilities or obligations.
> (VII) The success or failure of the independent contractor's business depends on the relationship of business receipts to expenditures.

Fla. Stat. § 440.02(15)(d)b. (2016).

In order to assert a claim for damages under FDUTPA, the plaintiff must establish: "(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." Baptist Hosp., Inc. v. Baker, 84 So. 3d 1200, 1204 (Fla. 1st DCA 2012) (internal citations omitted); see also Fla. Stat. § 501.204(1) (2016) ("Unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."[9]). "The concept of 'unfair or deceptive acts' is not clearly defined . . . .," Advanced Prot. Techs., Inc. v. Square D Co., 390 F. Supp. 2d 1155, 1164-65 (M.D. Fla. 2005). The Florida Supreme Court has indicated that "[a]n unfair practice is one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." PNR, Inc. v. Beacon Prop. Mgmt., Inc., 842 So. 2d 773, 777 (Fla. 2003) (internal quotation marks and citations omitted). "[D]eception occurs if there is a 'representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment.'" Id. (quoting Millennium Commc'ns & Fulfillment, Inc. v. Office of Attorney Gen., Dep't of Legal Affairs, State of Fla., 761 So. 2d 1256, 1263 (Fla. 3d DCA 2000)). In accordance with these standards, it seems no reported case has found a FDUTPA violation in the absence of intentional misconduct on the part of the defendant.

In the instant case, there was no deception. The Plaintiffs entered into an agreement with Gulf Coast to lease appropriately outfitted taxicabs and other services and that is precisely the relationship that ensued between the parties, pursuant to the Agreement and the

---

[9] "'Trade or commerce' means the advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated. 'Trade or commerce' shall include the conduct of any trade or commerce, however denominated, including any nonprofit or not-for-profit person or activity." Fla. Stat. § 501.203 (2016).

alleged facts. If the Plaintiffs were, as they allege in paragraph 19 of the Complaint, "consumers," they were consumers of services provided by the Defendant. Those services, set forth in great detail in the Agreement were all provided, on the terms that were completely fulfilled. In fact, the Plaintiffs allege no deception except that they were not contractors but employees. But the Defendant never said the Plaintiffs or anybody else were anything but what the contract characterized them as: independent business people renting a car. The Defendants never promised compensation or wages. There was no misrepresentation.

Importantly, the Plaintiffs allege that they were both employees and consumers. The issue of whether employees may invoke FDUTPA has been the subject of several recent decisions. Those decisions involved a party conceding that he or she was not a consumer but arguing that amendments to FDUTPA extended its reach to persons who are not consumers. The cases have produced different results. But the Plaintiffs would have to forego the benefits of those decisions holding that employees who allege misclassification are persons who may sue for a violation of FDUTPA by conceding that they are consumers and in that capacity clearly covered the law. But because they seek recognition as both consumer and employee the issue must be addressed.

The Defendant contends first that if the Plaintiffs were in fact employees of Gulf Coast, as they allege, and not consumers, as they also contend, then they lack standing to bring an action under FDUTPA. See Dobbins v. Scriptfleet, Inc., No. 8:11-CV-1923-T-24, 2012 WL 601145, at *2 (M.D. Fla. Feb. 23, 2012) (dismissing FLSA-plaintiff's FDUTPA claim, because she did not allege facts suggesting there was a consumer relationship between

18

her and the alleged employer); <u>Leon v. Tapas & Tintos, Inc.</u>, 51 F.Supp. 3d 1290 (2014) (same). But these cases were brought by plaintiffs who conceded that they were not consumers, but claimed nevertheless to be entitled to bring a claim under FDUTPA because a 2001 amendment of the statute—which replaced the word "consumer" with "person" in the statutory provision affording individuals a private right of action for damages—was intended to allow non-consumers to sue for damages. As noted, two cases support this argument, but they are not persuasive.[10]

Most importantly, the Plaintiffs allege that they are consumers and they indeed are. Through their execution of the Agreement, the Plaintiffs became consumers of the services offered by the Defendant. But they do not allege any misrepresentation or deception in that transaction. They plead in fact that they got exactly what they contracted for. Use of a vehicle

---

[10] The first case, <u>Seijo v. Casa Salsa, Inc.</u>, denied the defendant's motion for summary judgment on the FLSA-plaintiff's FDUPTA claim, which alleged that the defendant had misclassified her as an independent contractor when she was in fact an employee, reasoning that an employee can bring a FDUPTA claim even if she is not a consumer. <u>Seijo</u> did not acknowledge any adverse authority on this point and cited to only a single, inapposite case to support its conclusion: <u>Furmanite Am., Inc. v. T.D. Williamson, Inc.</u>, 506 F. Supp. 2d 1134, 1146 (M.D. Fla. 2007). In <u>Furmanite</u>, the parties were competing businesses and the dispute was over "misappropriation of . . . trade secrets and confidential information," among many other things. <u>Id.</u> The case held only that businesses have standing to sue each other for "damages from outlawed acts and practices in ordinary business transactions . . . ." <u>Id.</u> (emphasis in original). <u>Furmanite</u> reflects the fact that FDUTPA has two express purposes: (1) "[t]o protect the consuming public . . . from . . .  unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce," and (2) "[t]o protect . . . <i>legitimate business enterprises from those who engage in unfair methods of competition</i> . . . ." Fla. Stat. § 501.202(2) (emphasis added); <u>see also</u> 501.202(3). Furmanite falls under the second prong. It does not support <u>Seijo</u>'s conclusion that a plaintiff who is neither a consumer nor a business may sue under FDUTPA.

The second case to hold that an FLSA plaintiff who is not a consumer has standing to pursue a FDUPTA claim is <u>Bishop v. VIP Transp. Grp., LLC</u>, No. 615CV2118ORL22KRS, 2016 WL 1253734, at *1 (M.D. Fla. Mar. 15, 2016), <u>report and recommendation adopted</u>, No. 615CV2118ORL22KRS, 2016 WL 1244725 (M.D. Fla. Mar. 30, 2016). The court reasoned that "three of Florida's District Courts of Appeal have" held "that a person need not be a consumer to have standing to pursue a claim for monetary damages under FDUTPA." <u>Id.</u> at *2, *3; (citing <u>Bailey v. St. Louis</u>, No. 2D13-612, 2016 WL 403168 (Fla. 2d DCA Feb. 3, 2016); <u>Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cty., Inc.</u>, 169 So. 3d 164 (Fla. 4th DCA 2015); <u>Off Lease Only, Inc. v. LeJeune Auto Wholesale, Inc.</u>, 187 So. 3d 868, 870 n.2 (Fla. 3d DCA 2016), <u>reh'g denied</u> (Mar. 23, 2016) (but only in dicta)). However, these DCA opinions, like the <u>Furmanite</u> opinion relied on by <u>Seijo</u>, assess only the extent to which FDUTPA permits a business to sue another business. None of them suggests an employee—who is neither a consumer nor a business—can sue his or her employer.

suitable for use as a taxicab and associated services which are also necessary for such an enterprise. The Plaintiffs cannot state a claim for relief under FDUTPA.

    **C.**    **Francois's conversion claim is due to be dismissed because Francois does not seek to recover "specific property capable of identification" as required by the relevant case law, and the action sounds in breach of contract, not tort.**

Francois individually alleges conversion under Florida common law. He states that, pursuant to his lease agreement with Gulf Coast, he was "required to post a bond with Defendant in the amount of $1500." (Dkt. 6 ¶ 168). The bond was to be paid according to "Schedule A" in the "Agreement for Independent Vehicle-For-Hire Operators" ("Agreement"). (Dkt. 6 ¶ 166, 167). As discussed above, the Agreement was not in fact attached to the Complaint, but Gulf Coast has attached it herein as Exhibit 1. It states that the bond was "payable at $2.00 per day." (Ex. 1 at Schedule A, Page 2B). It further states that "[a]ny unused bond monies will be returned thirty (30) days after written request by the Driver, who posted the bond, less any shortages, charges and/or damages." Id. Francois contends that after "[he] informed Gulf Coast that he would no longer be working for Gulf Coast as a taxicab driver" (Dkt. 6 pp 170) and "requested return of his bond in writing," (Dkt. 6 ¶ 169), Gulf Coast "knowingly fail[ed] to return [it] within thirty days . . . ." (Dkt. 6 ¶ 174). As discussed below, he fails to state a claim for conversion because he does not allege all conditions precedent. In particular, the bond on which he seeks to recover is not a proper subject of such a claim, and the action sounds in breach of contract, not tort.

"Conversion is an unauthorized act which deprives another of his property permanently or for an indefinite time." Tambourine Comercio Internacional SA v. Solowsky, 312 F. App'x 263, 271 (11th Cir. 2009) (internal alterations and citations omitted).

> A conversion claim for money also requires proof that the funds are specific and identifiable. . . . "Money is capable of identification where it is delivered at one time, by one act and in one mass, or where the deposit is special and the identical money is to be kept for the party making the deposit, or where the wrongful possession of such property is obtained."

Tambourine, 312 F. App'x at 272 (quoting Belford Trucking Co. v. Zagar, 243 So. 2d 646, 648 (Fla. 4th DCA 1970)).

> The requirement that the money be identified as a specific chattel does not permit as a subject of conversion an indebtedness which may be discharged by the payment of money generally. . . . . Therefore, where the parties have an open account, and the defendant is not required to pay the plaintiff identical moneys which he collected, there can be no action in tort for conversion. . . . . A mere obligation to pay money may not be enforced by a conversion action. . . . and an action in tort is inappropriate where the basis of the suit is a contract, either express or implied.

Belford Trucking Co. v. Zagar, 243 So. 2d 646, 648 (Fla. 4th DCA 1970) (citing, e.g., C.J.S. Trover & Conversion s 23).

In the instant case, Count III is due to be dismissed because the bond on which Francois seeks to recover is not "capable of identification" in the sense used by the relevant case law. It was not "[d]elivered at one time, by one act and in one mass."  Instead, it was "payable at $2.00 per day." (Ex. A at Schedule A, Page 2B). In addition, Gulf Coast was to deduct from the bond "any shortages, charges and/or damages." Id. This establishes that the bond was "an open account, [such that] the defendant [wa]s not required to pay the plaintiff identical moneys which he collected." Belford, 243 So. 2d at 648. By way of contrast, courts have found money is capable of identification (1) where "money [wa]s to be held in constructive trust until the occurrence of a specified event," (2) "where a sum of money sealed in an addressed envelope was misdelivered . . . and [(3)] where a specified sum of money in a deposit bag was never credited to the depositor's account . . . ." See id., 243 So.

2d at 648 (internal citations omitted). None of these three situations are analogous to the instant case.

In addition, Count III is based on a written contract, and "[a]mere obligation to pay money, generally, may not be enforced by a conversion action. Stated otherwise, an action in tort is inappropriate where the claim is based on a breach of contract." Douglas v. Braman Porsche Audi, Inc., 451 So. 2d 1038, 1039 (Fla. 3d DCA 1984) (affirming directed verdict for defendant on claim for conversion where "plaintiff paid a $3500 deposit [but] she was not informed by the salesperson that the automobile was already under contract to another customer," reasoning that the seller's duty to return the deposit was a mere contractual obligation). Indeed, where a purported conversion is premised on a breach of contract, the plaintiff must prove "the defendant's acts were 'not merely a failure to perform, but an affirmative and intentional act of converting the funds to his own use by allegedly stealing the monies to which he was entrusted.'" See  Pershing Indus., Inc. v. Estate of Sanz, 740 So. 2d 1246, 1248 (Fla. 3d DCA 1999) (internal citation omitted); see also Wilson Cypress Co. v. Logan, 162 So. 489, 491 (Fla. 1935). In the related context of civil theft, a tort action based on a breach of contract will lie only if the plaintiff produces "additional proof of 'an intricate sophisticated scheme of deceit and theft.'" Gersh v. Cofman, 769 So. 2d 407, 409 (Fla. 4th DCA 2000) (finding a reasonable juror could have concluded such a scheme existed where there was evidence the defendant had forged the plaintiff's name on five dividend checks, mailed them to a Rhode Island P.O. Box to which the defendant had access, and the checks were then deposited into accounts of the defendant, his wife, and his son) (quoting Trend Setter Villas of Deer Creek v. Villas on the Green, Inc., 569 So. 2d 766, 767 (Fla. 4th

DCA 1990) (noting that such a scheme was demonstrated where the evidence showed "embezzlement by the defendant of an escrow fund set up under a subscription agreement between the parties")).

In the instant case, the Plaintiff does not allege "an intricate sophisticated scheme of deceit and theft." He simply alleges he was not repaid his refundable bond. Accordingly, he fails to state a claim for conversion premised on a mere breach of contract.

## CONCLUSION

For the foregoing reasons, Gulf Coast respectfully requests this Court dismiss the Complaint for its failure to state a claim. The facts alleged by the Plaintiffs do not describe employment cognizable by the FLSA. They instead demonstrate that the Plaintiffs were not employees, but rather contractors of the Defendant. Neither does the Complaint state a claim under FDUTPA, because there was no misrepresentation. And the Complaint does not state a claim for relief for the tort of conversion.

Respectfully submitted,

/s/ Thomas M. Gonzalez
Thomas M. Gonzalez
Florida Bar No.: 192341
Tristan Reiniers
Florida Bar No. 0119358
Thompson, Sizemore, Gonzalez, & Hearing, P.A.
201 North Franklin Street, Suite 1600
Tampa, Florida 33602
Telephone: (813) 273-0050
Facsimile: (813) 273-0072
tgonzalez@tsghlaw.com
treiniers@tsghlaw.com
Attorneys for the Defendant

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished this 13th day of June, 2016, by CM/ECF electronic filing to the Clerk of Court and to the following:

Luis A. Cabassa
Wenzel Fenton Cabassa, P.A.
1110 N. Florida Avenue, Suite 300
Tampa, Florida  33602
Main # 813-224-0431
Direct# 813-379-2565
Fax: 813-299-8712
lcabassa@wfclaw.com
twells@wfclaw.com

/s/ Thomas M. Gonzalez
Attorney