# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**ESTIMÉ FRANÇOIS, and RENETTE
ORDEUS, on behalf of themselves and
all others similarly situated,**

 **Plaintiffs,**

**v.** **Case No.: 8:16-cv-01061-SCB-TBM**

**GULF COAST TRANSPORTATION, INC.,**

 **Defendant.**

_____/

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The Defendant, Gulf Coast Transportation, Inc. ("Gulf Coast"), moves pursuant to Rule

56 of the Federal Rules of Civil Procedure for summary judgment in its favor on the two

remaining counts of the first amended complaint filed by the Plaintiffs, Estimé François and

Renette Ordeus, which allege violations of the minimum wage provisions of the Fair Labor

Standards Act, 29 U.S.C. § 201, *et seq.* ("FLSA"), and the Florida Deceptive and Unfair Trade

Practices Act ("FDUTPA"). As grounds for its motion, Gulf Coast says there is no genuine

issue of disputed material fact, and Gulf Coast is entitled to judgment as a matter of law.

## MEMORANDUM OF LAW

### I.  Procedural Background

The Plaintiffs Francois and Ordeus are taxicab drivers who purchased services,

including the use of specially equipped vehicles, from Gulf Coast pursuant to a contract titled

"Agreement for Independent Vehicle-For-Hire Operators" ("Agreement"). (Ex. 1, ¶¶ 5, 6).[1]

---

[1] Three affidavits executed by Justin Morgaman, the Vice President of Gulf Coast, are attached to this motion as

They allege that they were in fact employees entitled to payment of a minimum wage.[2] The Plaintiffs originally sued Gulf Coast in a three-count amended complaint. Count I alleges a violation of the FLSA by the Defendant's failure to pay the Plaintiffs the minimum wage required by that law. Count II[3] alleges a violation of FDUPTA by the Defendant's misrepresentation of the Plaintiffs' status to be that of independent contractors. Count III, brought on behalf of Francois only, alleged conversion of the bond which he was required to post as a condition of the Agreement which he signed. (Dkt. 6).

Gulf Coast moved to dismiss the amended complaint for failure to state a claim upon which relief may be granted. (Dkt. 12). The motion was granted only with respect to Francois' conversion claim and otherwise denied. (Dkt. 40 at 10-11); (Dkt. 63 at 2, 5). The Plaintiffs, while represented by counsel, moved for conditional class certification with respect to the FLSA claim, (Dkt. 17), and nine other drivers filed notices of their intent to opt in. (Dkt. 63 at 2). The Plaintiffs also moved for class certification with respect to their FDUTPA claim. (Dkt. 29). However, because the Plaintiffs now proceed *pro se*, they cannot maintain a collective or class action, and the opt-in plaintiffs were dismissed without prejudice. (Dkt. 63 at 4, 5). The only remaining claims are the Plaintiffs' individual claims under the FLSA and FDUTPA. (Dkt. 63).

In the context of this motion, both claims are dependent on the single issue of whether the Plaintiffs, or each of them, were employees within the meaning of the FLSA. If they were

---

Exhibit 1 ("Ex. 1"), Exhibit 2 ("Ex. 2"), and Exhibit 3 ("Ex. 3"). Affidavits executed by Tom Campbell and Tom Castros are attached as Exhibit 4 ("Ex. 4") and Exhibit 5 ("Ex. 5"), respectively.
[2] Francois alleges he worked for Gulf Coast "[f]rom 2009 through January 2016," (Dkt. 17-4, ¶ 2); and Ordeus "[f]rom 2013 through February 2016." (Dkt. 17-4, ¶ 2).
[3] Actually, the complaint includes no Count II but two "Count IIIs." To differentiate between each Count III, Gulf Coast will refer to the first as "Count II" and the second as "Count III."

not, then neither has a claim to the FLSA minimum wage and Gulf Coast could not misrepresent their status.

## II. The Hillsborough County Public Transportation Commission's Regulatory Scheme

Chapter 2001-299, Laws of Florida, provides for the creation of the Hillsborough County Public Transportation Commission ("Commission"), directs the Commission to "regulate the operation of public vehicles," including taxicabs, "upon the public highways of Hillsborough County and its municipalities," and grants the Commission the authority to promulgate rules ("PTC Rules") to that effect.[4] §§ 2(1), 3(24). In Hillsborough County, "[a]ny person desiring to engage in the business of Operating any Public Vehicle must first acquire," from the Commission, "a Certificate," defined as the "written authority . . . to operate one or more Public Vehicles in [Hillsborough County] and its Municipalities." PTC Rules 1-1.001(6), 1-2.001(1). The Commission defines "Operate" as "causing a Public Vehicle to function on the roads, streets, or highways of Hillsborough County following or during the act of picking up a passenger" there. PTC Rule 1-1.001(30).

Having acquired a Certificate, a person must then obtain, for each Public Vehicle in his or her fleet, a "Permit," PTC Rule 1-3.001(2), which is a "license issued by the Commission to allow the operation of a particular Public Vehicle for which a Certificate has been issued." PTC Rule 1-1.001(32). Certificate holders may transfer Permits among themselves "upon approval of the Commission and payment of [a] prescribed fee." PTC Rule 1-3.001(6).

Certificate holders must meet a number of requirements. For example, they must

---

[4] Relevant excerpts of the PTC Rules are attached as Exhibit 6. They are also available online at the Commission's website. See Rules, Applications, Forms, & Rates, HILLSBOROUGH CNTY. PUBLIC TRANSPORTATION COMMISSION, http://hillsboroughcountyptc.com/applications-forms/ (then click hyperlink labeled "PTC Rules") (Aug. 1, 2016).

purchase insurance on their Permitted vehicles and maintain them in good repair, PTC Rule 1-4.001, 1-8.001, operate a "central[] dispatch[]" service, PTC Rule 1-7.001(13), and "maintain a central place of business" at which they keep a variety of "business records" and a lost-and-found. PTC Rule 1-7.001(1), (2), (7). The PTC Rules also state that "[t]axicab service must be provided 24 hours a day, seven days a week." PTC Rule 1-7.001(13). However, Certificate holders need not provide such service themselves. The PTC Rules allow a Certificate holder to "contract with individual operators," such as the Plaintiffs, "for the operation of [their] Public Vehicles . . . .," PTC Rule 1-7.001(12). In this arrangement, it is the driver, not the Certificate holder, who has the duty to transport any "orderly Person willing to pay the prescribed fare . . . ." PTC Rule 1-6.001(2). He or she undertakes this responsibility by contract with the Certificate holder. PTC Rule 1-5.001(20). For example, Gulf Coast, as described in more detail below, sells, to individual drivers, the use of Public Vehicles bearing the Permits issued under Gulf Coast's Certificate. Such drivers must obtain a Public Vehicle Drivers' License ("PVDL"), PTC Rule 1-5.001(1), "which authorizes [them] to Operate a Permitted Vehicle," PTC Rule 1-1.001(16), and requires filling out an application and paying a fee to the Commission. "Upon . . . discontinuation of an agreement to drive for a Certificate holder," the driver must return his or her PVDL to the Commission until signing a new agreement. PTC Rule 1-5.001(20).

"Driver Duties" are set forth in PTC Rule 1-6.001. Drivers must, among other things, "keep their Vehicle clean and orderly at all times," "be . . . well groomed and neat and clean in appearance," and "utilize the shortest possible route to the passenger's destination," unless the passenger requests otherwise. PTC Rule 1-6.001(2), (6), (7), (8). If any driver or Certificate holder

"fails to comply with or . . . violates any of the provisions of [the PTC Rules]," he or she may be subject to probation, fines/citations, or suspension or revocation his or her Certificate, Permit(s), or PVDL. PTC Rule 1-12.001(1)(c)1. The PTC Rules "may be enforced by the Commission, the Commission staff and other law enforcement officials." PTC Rule 1-15.001(1).

## III.   Legal Argument

The Agreement which the parties signed expressly provides that the Plaintiffs were independent contractors, not employees, (Ex. 1 at Ex. A, ¶ 8; Ex. B, ¶ 8), and contains no provisions which create or allow an employer-employee relationship. Nothing in the Agreement speaks of control over the Plaintiffs' wages, hours or any other terms or conditions of employment. The Agreement expressly negates such control, providing that the signers of the Agreement are "buying services from the [Defendant] to facilitate performance of transportation services, free from interference or control on the part of the [Defendant]." (Id.). Therefore the contention that the Plaintiffs are in fact employees of the Defendant travels exclusively on the theory that the contracts are in fact fraudulent and that their terms are not those on which the Plaintiffs operated their vehicles, and more specifically that there existed some employment relationship that was formed exclusive of, and in direct contravention to, the terms of the written contract which each has executed. The Plaintiffs have not and cannot produce any evidence to support that conclusion.

It is undisputed that, unlike the "the usual path of an employee," Scantland v. Jeffry Knight, Inc., 721 F.3d 1308, 1311 (11th Cir. 2013), the Plaintiffs' income was a function of revenue minus costs: They paid Gulf Coast a flat fee for the use of a cab and related services regardless of their income on any particular day, and they retained all passenger fares and tips. (Dkt. 21, ¶ 15). Because Gulf Coast had no stake in the Plaintiffs' income, Gulf Coast had no

incentive to take interest in the details of their work, and it did not do so. The Plaintiffs were free to operate their taxicabs and solicit fares in any manner allowed by the laws applicable to the operation of a taxicab. They had complete discretion as to which dispatched calls to accept and which routes to take. They engaged with Gulf Coast only on a short-term basis, in increments of a week, a day, or twelve hours. (Ex. 1 at Ex. A, Schedule A; Ex. B, Schedule A). The amended complaint pleads that there are other taxicab companies with which Plaintiffs had the choice to engage. (Dkt. 6, ¶ 72). The only meaningful degree of control over the details of the Plaintiffs' work was imposed by governmental bodies, not Gulf Coast. The Plaintiffs were in fact properly treated as independent contractors, so there was no violation of the FLSA or FDUTPA. The Plaintiffs' FDUTPA claim fails because there was no deception, unfair competitive advantage, or legally cognizable damages. These arguments are developed below.

### A. The Plaintiffs bear the burden of producing evidence beyond the pleadings to establish their purported employment status.

"Individuals seeking compensation pursuant to the FLSA 'bear the initial burden of proving that an employer-employee relationship exists and that the activities in question constitute employment for purposes of the Act.'" Freeman v. Key Largo Volunteer Fire & Rescue Dep't, Inc., 841 F. Supp. 2d 1274, 1279 (S.D. Fla.) (citing Purdham v. Fairfax County Sch. Bd., 637 F.3d 421, 427 (4th Cir.2011)), aff'd, 494 F. App'x 940 (11th Cir. 2012) (affirming dismissal of FLSA action where complaint did not plausibly allege facts suggesting plaintiff was employee, as opposed to paid volunteer, applying the "economic reality" test courts also use to assess independent contractor status); see also, e.g., Kaplan v. Code Blue Billing & Consulting, Inc., No. 11-81049-CV, 2012 WL 8969063, at *3 (S.D. Fla. Mar. 12, 2012) (same), aff'd sub nom. Kaplan v. Code Blue Billing & Coding, Inc., 504 F. App'x 831 (11th Cir. 2013);

Reich v. ConAgra, Inc., 987 F.2d 1357, 1360 (8th Cir. 1993) (reversing summary judgment for Secretary of Labor and holding district court incorrectly placed on defendant burden of proving non-existence of employer-employee relationship, reasoning non-existence of relationship was not affirmative defense; rather, existence of relationship was element of prima facie case on which Secretary bore burden). Thus in order to survive summary judgment, the Plaintiffs must produce evidence sufficient to allow a jury to find that they were employees, not independent contractors. As argued below, they have not, and cannot, do so.

"[W]here," as here, "the nonmoving party will bear the burden of proof at trial on a dispositive issue," the summary judgment movant need only "point[] out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 324, 325 (1986). "Once the moving party makes th[at] required showing, the burden shifts to the non-moving party to rebut that showing by producing affidavits or other relevant and admissible evidence beyond the pleadings. . . . and the non-moving party cannot satisfy its burden if the rebuttal evidence is merely colorable, or is not significantly probative of a disputed fact . . . ." Josendis v. Wall to Wall Residence Repairs, Inc., 662 F.3d 1292, 1315 (11th Cir. 2011) (internal quotations and citations omitted). "[A] mere scintilla of evidence is . . . insufficient." Kernel Records Oy v. Mosley, 694 F.3d 1294, 1301 (11th Cir. 2012). In the instant case, Gulf Coast is entitled to summary judgment because the Plaintiffs cannot meet their burden.

**B. The Plaintiffs are not entitled to relief under the FLSA because they were independent contractors, not employees.**

"To determine whether an individual falls into the category of covered employee or exempted independent contractor, courts look to the economic reality of the relationship between

the alleged employee and alleged employer" and assess whether the employer "control[s] the relationship in much the same way a company would control its employees." <u>Scantland</u>, 721 F.3d at 1311-12, 1319 (internal citations and quotation marks omitted). Courts have identified the following factors to be relevant to this determination, although the list is not exhaustive and no one factor is controlling:

> (1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed;
> (2) the alleged employee's opportunity for profit or loss depending upon his managerial skill;
> (3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers;
> (4) whether the service rendered requires a special skill;
> (5) the degree of permanency and duration of the working relationship; [and]
> (6) the extent to which the service rendered is an integral part of the alleged employer's business.

(Dkt. 40 at 5, 6) (quoting <u>Scantland</u>, 721 F.3d at 1311-12 (internal citations omitted)). This motion addresses each of these factors in detail below, each under a separate heading.

The issue of whether taxicab drivers are employees has been extensively litigated through the years, primarily in the context of the National Labor Relations Act ("NLRA"). Decisions as to employee status under the NLRA are persuasive in FLSA cases because "[t]he [FLSA] . . . is a part of the social legislation of the 1930's of the same general character as the [NLRA] . . ." <u>Rutherford Food Corp. v. McComb</u>, 331 U.S. 722, 723 (1947) (quoted by <u>Hodgson v. Griffin & Brand of McAllen, Inc.</u>, 471 F.2d 235, 237 n.1 (5th Cir. 1973)).  The result of these cases is that, as a matter of law in the Eleventh Circuit and elsewhere, taxicab drivers are deemed independent contractors in situations where—as in the instant case—the drivers exercise discretion in their day-to-day movements and generally "pay[] a fixed rental, regardless of [their] earnings on a particular day, and . . . retain[] all the fares [t]he[y] collect[]. . . ." <u>Local 777, Democratic Union</u>

Org. Comm., Seafarers Int'l Union of N. Am., AFL-CIO v. N. L. R. B., 603 F.2d 862, 879 (D.C. Cir. 1978), opinion adhered to on denial of reh'g, (D.C. Cir. June 20, 1979) (denying enforcement of National Labor Relations Board ("NLRB") decision that taxicab drivers were employees under the NLRA) (quoted by N.L.R.B. v. Associated Diamond Cabs, Inc., 702 F.2d 912 (11th Cir. 1983) (same)); see also Yellow Taxi Co. of Minneapolis v. N.L.R.B., 721 F.2d 366 (D.C. Cir. 1983) (same); Air Transit, Inc. v. N.L.R.B., 679 F.2d 1095 (4th Cir. 1982) (same); Sida of Hawaii, Inc. v. N.L.R.B., 512 F.2d 354 (9th Cir. 1975) (same); Bui v. Minority Mobile Systems, Inc., No. 15-21317-CIV, 2016 WL 344969 (S.D. Fla. Jan. 28, 2016) (holding company drivers who worked transporting disabled individuals were independent contractors under FLSA); Arena v. Delux Transp. Servs., Inc., 3 F. Supp. 3d 1, 3 (E.D.N.Y. 2014) (holding taxicab driver was independent contractor under FLSA) (citing Associated Diamond Cabs., 702 F.2d 912); AAA Cab Servs., Inc. & Indep. Taxi Drivers Union, 341 NLRB 462 (2004) (holding taxicab drivers were independent contractors under NLRA); Checker Cab Co., 273 NLRB 1492 (1985) (same).

Conversely, taxicab drivers have been deemed employees only when the cab company "micromanage[s]" the drivers and/or collects a percentage of their fares. Elite Limousine Plus, Inc., 324 NLRB 992, 1004 (1997). As the NLRB explains,

> A flat fee is evidence of an independent contractor relationship because it places on the drivers a strong incentive to maximize their trips, since, once the flat fee is recouped, income is largely profit. In addition, a flat fee insulates a company from variations in income because regardless of the drivers' earnings the company receives the same amount from the drivers.

Id. Turning to the instant case, the evidence compels the conclusion that the Plaintiffs were independent contractors, despite their claim to the contrary.

**1. Gulf Coast did not control the details of the Plaintiffs' work.**

The Plaintiffs allege that they "were required to pay Gulf Coast for the use of the taxicabs," (Dkt. 17-5, ¶ 10), and "were not paid wages, only generating revenue from passenger fares," (Dkt. 17-5, ¶ 9); (Dkt. 17-4, ¶ 8), "a large portion of which were paid to Gulf Coast." (Dkt. 17-4, ¶ 9). It is true that they paid a flat fee to Gulf Coast and kept all passenger fares, but, as discussed above, these facts mitigate in favor of independent contractor status, not against it—regardless of how much of their fare revenue they budgeted to cover the the flat fee. In addition, the fact that Gulf Coast deducted no taxes from the Plaintiffs' receipts (Dkt. 29 at page 26, ¶ 9) is also a "strong indication of absence of employee status." <u>Associated Diamond</u>, 702 F.2d at 924, n.3.

In addition, the Court has "ma[d]e clear that . . . to the extent that Defendant is merely requiring compliance with the PTC Rules, such will not be considered control by Defendant." (Dkt. 40 at 6, 7) (citing <u>Associated Diamond</u>, 702 F.2d at 922). For the Plaintiffs to demonstrate the existence of an employment relationship, they must show "*pervasive* control by Defendant that exceeds *to a significant degree* the scope of the PTC Rules . . . ." (Dkt. 40 at 7) (emphases added). This, the Plaintiffs cannot do.

For example, the Plaintiffs allege that "all cab fare rates . . . were mandated by Gulf Coast," (Dkt. 17-4, ¶ 7); (Dkt. 29 at page 26, ¶ 8), but the Court found that the PTC Rules, not Gulf Coast, determine the fare amounts that can be charged to passengers. (Dkt. 40 at 7) (citing PTC Rules 1-9.001, 1-10.001, and 1-20.001). Similarly, the Plaintiffs note that "[a]ll taxicab drivers were . . . subjected to a mandatory grooming policy," (Dkt. 17-5, ¶ 8), and that all taxicab drivers "were required by the Defendant to accept credit cards." (Dkt. 17-5, ¶ 8); (Dkt. 17-4, ¶ 7), but the Court found that the PTC Rules, not Gulf Coast, require adherence to a

"grooming policy" and require drivers to accept credit cards as a form of payment. (Dkt. 40 at 7) (citing PTC Rules 1-6.001(7), (8)). The Plaintiffs also complain that all taxicab drivers were required to advertise for Gulf Coast by driving a car with Gulf Coast's insignia, (Dkt. 17-4, ¶ 5); (Dkt. 17-5, ¶ 5), but the PTC Rules require Gulf Coast's name and telephone number to be permanently displayed upon both sides of the cabs. PTC Rule 1-8.001(1)(q); see also PTC Rule 1-7.001(3), (10). The Plaintiffs note that Gulf Coast offered training to new drivers, (Dkt. 6, ¶ 53), but the PTC Rules warn that companies that do not do so are less likely to be awarded a Certificate or additional Permits. PTC Rule 1-22.001.

The Plaintiffs additionally argue that it is "nearly impossible for an individual taxicab driver to obtain a taxicab permit that is valid in Hillsborough County," (Dkt. 6, ¶ 68), so their "only realistic option" was to "enter into a 'lease' agreement with . . . Gulf Coast" or one of its competitors. (Dkt. 6, ¶ 72). However, the procedure for obtaining a taxicab permit is up to the Commission, not Gulf Coast, and therefore cannot contribute to a finding of employee status.

The Plaintiffs also complain that Gulf Coast required them to wait in line when picking up passengers at the Tampa International Airport ("TIA"). (Dkt. 6, ¶¶ 63, 64). However, "Gulf Coast d[id] not require any driver to wait for, pick up, or take passengers to TIA . . . ." (Ex. 2, ¶ 12). To the extent the Plaintiffs chose to do so, they were indeed subject to some restrictions, but those restrictions were imposed by the Hillsborough County Aviation Authority ("Authority"),[5] not Gulf Coast, pursuant to Gulf Coast's concession agreement with the

---

[5] "The Hillsborough County Aviation Authority is an independent special district of the State of Florida, established by the 1945 Florida Legislature with exclusive jurisdiction, control, supervision and management over all publicly owned airports in Hillsborough County," including TIA. See Airport Administration, TAMPA INT'L AIRPORT, http://www.tampaairport.com/airport-administration (last visited March 14, 2017) (providing links to the Authority's enabling act and its amendments).

Authority. (Ex. 2). For example, the Authority required drivers, among other things, to "proceed to designated area(s) and then wait in order to admit passenger(s) in an organized fashion." (Id., ¶¶ 8, 9). Significantly, the Authority, not Gulf Coast, enforces the terms of the concession agreement. (Id., ¶ 10). Because the Authority is a third party and government entity, the restrictions it imposed on drivers do not mitigate in favor of finding employee status. See (Dkt. 40 at 6, 7); see also, e.g., Air Transit, Inc., 679 F.2d at 1100 (finding airport taxicab drivers were independent contractors despite being subject to "requirements . . . mandated by [defendant]'s contract with the [Federal Aviation Administration ("FAA")]," noting as well that "controls which are designed to protect [the defendant]'s contract with the FAA obviously inure to the benefit of the drivers as well as [the defendant]"); Sida of Hawaii, Inc., 512 F.2d at 359 (finding taxicab drivers were independent contractors even though airport imposed restrictions on drivers through concession agreement with purported employer).

The Plaintiffs also complain that Gulf Coast "set [their] work schedule," (Dkt. 21, ¶ 10); (Dkt. 29 at 20, ¶ 10), but they do not explain how, and there is nothing in the Agreement that speaks of such control. The statement is in fact inconsistent with the allegations of the amended complaint, in which they note that they had the choice of whether to lease cabs on a 12-hour, twenty-four-hour, or weekly basis, and could "'split' one or more days with another driver, so that each driver work[ed] a twelve-hour shift during that day." (Dkt. 6, ¶¶ 74, 75); (Ex. 1 at Ex. A, Schedule A; Ex. B, Schedule A); see also Bui, 2016 WL 344969, at *7 (disregarding plaintiffs' affidavits where they were "conclusory statements completely unsupported by the record. . . . internally inconsistent, and also inconsistent with the record

evidence). As a matter of law, courts have held that this flexible arrangement in fact mitigates strongly in favor of independent contractor status because it leaves the work schedule entirely up to the driver. See Associated Diamond, 702 F.2d at 921 (finding facts mitigated in favor of independent contractor status where drivers could lease cabs (1) annually, (2) daily, (3) for a ten-hour period from 5:30 A.M. to 3:30 P.M., or (4) for a fourteen-hour period from 3:30 P.M. to 5:30 A.M.). Tom Campbell and Tom Castros, two drivers who engaged with Gulf Coast and signed the same Agreement as the Plaintiffs, each testified that "I establish my own hours and locations of operation and Gulf Coast has no role in establishing where, when or if, I work." (Ex. 4, ¶ 3); (Ex. 5, ¶ 3). Indeed, the Agreement contains no provisions that speak to control over the Plaintiffs' schedule.

In short, the Plaintiffs' declaration that Gulf Coast "set [their] work schedule" is insufficient to create a genuine factual dispute on the issue for which it is offered. The statement merely reiterates part of a sentence in paragraph twenty-six of the amended complaint without factual elaboration. See Roslindale Co-op. Bank v. Greenwald, 638 F.2d 258, 261 (1st Cir. 1981) (holding affidavits were insufficient at summary judgment where they "[we]re merely conclusory reiterations of the allegations of the complaint . . . ."). It is conclusory because it does not explain *how* Gulf Coast allegedly "set" the plaintiffs' "work schedule" or provide supporting facts. See, e.g., Evers v. Gen. Motors Corp., 770 F.2d 984, 986 (11th Cir. 1985) (disregarding expert affidavit as conclusory in products liability case, which was premised on defendant's failure to install air bag in the plaintiff's car, where the affidavit stated that an air bag would probably have prevented plaintiff's injuries but did not explain "*how* an 'air bag' would have aided in [the] collision," and affidavit "sharply

contradicted" deposition testimony of witness who stated there was no defect because air bags weren't designed to protect against the kind of impact plaintiff suffered (emphasis added)); <u>see also</u> <u>Evans v. Books-A-Million</u>, 762 F.3d 1288 (11th Cir. 2014) (holding, in employment-discrimination action,  that district court properly struck, as conclusory, portions of plaintiff's summary judgment affidavit, which stated things such as "(1) '[Similarly situated] [m]ales with less experience . . . were making more money than me.'; [and] (2) '[Male employees] were able to advance more quickly financially [than] I was,'" "finding that these statements were conclusory and speculative" because the affidavit "did not provide specific, supporting facts regarding, for example, the amount of the other employees' salaries compared to hers, [or] the details of other employees' financial advancement").

The Plaintiffs also suggest that Gulf Coast controlled drivers through its dispatch system in a way that limited their ability to operate independently or grow their own client lists. However, their allegations on this point are internally inconsistent as well as inconsistent with each other. Francois states, "All taxicab drivers were dependent on Gulf Coast's dispatcher for most, if not all, of their passengers." (Dkt. 17-4, ¶ 4). In a subsequent affidavit, he states that "I relied on and *exclusively* used Defendant's dispatch system, through which I received th*e great majority* of their passenger calls, to perform my job." (Dkt. 29, ¶ 12) (emphasis added). Ordeus testifies, "All taxis were equipped with radios through which Gulf Coast dispatchers assigned passengers to taxicab drivers. This was the *sole* means *allowed* for doing business *aside from the rare walk-on passenger who hailed a taxi from the street*. (Dkt. 21, ¶ 6, emphasis added). Ordeus and Francois also both declare under oath that they "*could not* contact potential customers directly. Instead, the *great majority* of their passenger calls

were routed through Defendant's dispatch service." (Dkt. 21, ¶ 13) (emphasis added); (Dkt. 29 at 20, ¶ 13) (emphasis added). Courts disregard declarations where they exhibit such inconsistencies. Bui, 2016 WL 344969, at *7 (disregarding plaintiffs' affidavits where they were "conclusory statements completely unsupported by the record. . . . internally inconsistent, and also inconsistent with the record evidence).

In any event, the Plaintiffs do not contend that dispatch was the only means allowed for locating potential passengers. Indeed, it was not. The Agreement provides that the Plaintiffs were "free to perform all or part of [their] services independently of [Gulf Coast]'s communication system, data system, or concession agreements secured or provided by [Gulf Coast]." (Ex. 1 at Ex. A, ¶ 8; Ex. B, ¶ 8). They had complete discretion as to whether to use Gulf Coast's dispatch system, and there was no penalty for choosing not to accept a dispatched call. (Ex. 3, ¶ 4). Indeed, Campbell and Castros "solicit customers in [their] own ways" and generate "[a] significant amount of the[ir] fares and gross revenues . . . from sources by [their] own efforts and not through Gulf Coast['s] dispatch computer." (Ex. 4, ¶¶ 5, 8); (Ex. 5, ¶¶ 5, 8). For instance, the Plaintiffs could wait at cabstands or TIA, or they solicit passengers in busy areas. (Ex. 3, ¶ 4). Where, as here, participation in a dispatch system is voluntary, this "favors a finding of independent contractor status," because even if "the largest percentage of the Company's business is handled through radio dispatches," "it is the driver's independent choice to forego responding to dispatched calls." Associated Diamond, 702 F.2d at 923.

After voluntarily accepting a dispatched fare, drivers might choose to abandon the call because a better one becomes available. Doing so renders a driver unable to use the dispatch system for a specific period of time. (Ex. 3, ¶ 5). However, the "requirement that drivers service

a dispatch once they accept it, does not preclude the finding of independent contractor status. . . . company-devised rules obligating drivers to serve a fare once it is accepted relate primarily to the orderly dispatch of taxicabs and are not significant factors regarding independent contractor status." <u>AAA Cab Servs., Inc.</u>, 341 NLRB at 465 (internal quotation marks, alterations, and citations omitted); <u>see also</u> <u>FedEx Home Delivery v. N.L.R.B.</u>, 563 F.3d 492, 501 (D.C. Cir. 2009) ("Where a company's control over an aspect of the workers' performance is motivated by a concern for customer service, that control does not suggest an employment relationship . . . . Likewise, an incentive system designed to ensure that the drivers' overall performance meets the company standards is fully consistent with an independent contractor relationship." (internal quotation marks, alterations, and citations omitted)).

In the portions of the Plaintiffs' declarations quoted above, the Plaintiffs do not explain why they "could not contact potential passengers directly" or had "no opportunity to compile customer lists or grow [their] own clientele base." (Dkt. 21, ¶¶ 13, 14); (Dkt. 29 at 20, ¶¶ 13, 14). Conspicuously, the Plaintiffs do not state that Gulf Coast forbade them from doing these things. Indeed, the Agreement imposes no such restrictions, and Justin Morgaman, the Vice President of Gulf Coast, testified that Gulf Coast has never punished a driver for directly contacting customers or attempting to grow their own clientele base, and that Gulf Coast has no authority to do so. (Ex. 3, ¶ 7). Gulf Coast encourages drivers to grow their own clientele base by "distribut[ing] blank [business] cards which can be used for this purpose." (Ex. 4, ¶4). Castros and Campbell each maintain a business phone and distribute their direct number to passengers. (Ex. 5, ¶¶ 4, 5); (Ex. 4, ¶¶ 4, 5). Campbell "regularly distribute[s] [his] own business cards and contact information directly to [his] passengers." (<u>Id.</u>).

Even if, for summary judgment purposes, this Court draws the inference that Gulf Coast discouraged the Plaintiffs from growing their own businesses, that fact would be insufficient to prevent summary judgment in favor of Gulf Coast. See Herman v. Mid-Atl. Installation Servs., Inc., 164 F. Supp. 2d 667, 677 n.10 (D. Md. 2000) (finding that plaintiffs' alleged non-compete agreements with defendant would only be "somewhat indicative" of employee status and could not overcome countervailing evidence of plaintiffs' economic independence, noting "[i]t is not uncommon to have non-compete clauses in contracts"), aff'd sub nom. Chao v. Mid-Atl. Installation Servs., Inc., 16 F. App'x 104 (4th Cir. 2001); see also Lindsley v. BellSouth Telecommunications Inc., 401 F. App'x 944, 946 (5th Cir. 2010) (affirming summary judgment for FLSA defendant, finding fact that plaintiff was barred from working for defendant's competitors did not confer employee status in face of countervailing factors).

On these issues, Bui v. Minority Mobile Systems, Inc. is instructive because it found that drivers were not employees despite having far less independence than the Plaintiffs did when it came to reliance on dispatch and the alleged inability to grow a client base. 2016 WL 344969. In Bui, the plaintiffs transported the handicapped for a company under contract with Miami-Dade County and sued the company alleging misclassification as independent contractors. Id. The drivers had absolutely no discretion as to whom they picked up and could not establish their own customer lists. Instead, they "were . . . provided with a daily manifest of the trips to be taken for the day" which "provided the name and address of each passenger and a scheduled pick-up time." Id. at *2. Nevertheless, the court found the drivers were independent contractors, not employees, reasoning that "[w]hile Plaintiffs may not have been able to deviate from the exact specifications of each manifest, i.e. who to pick up, when, and

from where, it was within their discretion to determine how many pick-ups to complete on each manifest and whether or not they drove on a certain day." Id. at *6. The Bui court also noted that the

> Plaintiffs were free to take time off whenever they wanted; Plaintiffs determined how to transport passengers, including what route to take; Plaintiffs managed their own expenses with respect to the transportation of passengers, including fuel, tolls, car washes, traffic infractions, maps, and other out-of-pocket expenses such as fees for obtaining chauffeur and HACK licenses; Plaintiffs were free to perform services for other special transportation services providers; and Plaintiffs could terminate their contract for services with Defendants at any time.

Id. In the instant case, the Plaintiffs have even more independence than the drivers in Bui. The Plaintiffs were not bound to follow the terms of a manifest but could pick up whomever they chose, whenever they wanted. And like the Bui plaintiffs, Francois and Ordeus managed their own expenses, were free to obtain taxicabs and related services from other companies, and could terminate their engagement with Gulf Coast at any time.

The Plaintiffs emphasize that they worked long hours ranging from 105-120 hours per week in order to "avoid living in poverty." (Dkt. 17-4, ¶ 10); (Dkt. 17-5, ¶ 11). The same contention could be made by an employee who must work a lot of hours because of the employee's low wage rate. In fact it was the Plaintiffs' independent choice to work as taxicab drivers. No one forced them to do so. The undersigned is aware of no authority holding that the need for a contractor to work long hours due to the unprofitability of his or her enterprise constitutes control by the contractee.

Lest the Plaintiffs confuse the issue, it is important to note that "[e]conomic dependence" as used in the economic realities test, "is *not* conditioned on reliance on an alleged employer for one's primary source of income, for the necessities of life. Rather, the proper test

of economic dependence mandates consideration of all the factors, and in light of such consideration examines whether the workers are dependent on a particular business or organization *for their continued employment* in that line of business." Brock v. Mr. W Fireworks, Inc., 814 F.2d 1042, 1054 (5th Cir. 1987) (emphasis in original) (finding firework stand operators were employees even though the work was only seasonal and the income supplemental).

In the instant case, the Plaintiffs were not economically dependent on Gulf Coast because they were free to obtain taxicabs and related services from other companies. (Ex. 3, ¶ 6). To the extent they chose not to do so, that choice was motivated by economic incentives and not imposed by Gulf Coast. Cf. Herman, 164 F. Supp. 2d at 676 (finding cable installers were independent contractors, although "working for competitors was discouraged," because "there was no real incentive or time to work for [the defendant's] competitors," as the defendant "generally had full assignments for the Installers, [and] there was no reason to switch from one broker to another or to work for more than one at any given time.").[6]

**2.  The Plaintiffs' had the opportunity for profit or loss depending on their skill.**

The Plaintiffs had the opportunity for profit or loss depending on their skill because each driver's income was a function of revenue (fares and tips) minus costs (the fixed lease payment, and the cost of refueling the cab). See Arena, 3 F. Supp. 3d at 12 (finding taxicab driver had opportunity for profit or loss under FLSA) (citing Associated Diamond, 702 F.2d at 924). Thus, Drivers could maximize profit by optimizing routes, accumulating their own

---

[6] Of course, the Plaintiffs in the instant case, unlike the cable installers in Herman, did not work for the defendant; they merely obtained the use of a cab and related services.

customer lists, and learning when it is best to use Gulf Coast's various cabstands, TIA's pick-up line, or the dispatch system, depending on the relative profitability of each at different times.

### 3. The Plaintiffs made significant investments in equipment and materials.

The drivers invested in equipment and materials by (1) renting taxicabs and related services from Gulf Coast for approximately $560 per week, totaling $29,120 a year,[7] (2) depositing a refundable bond of $1,500 with Gulf Coast, (3) purchasing all necessary gasoline, and (4) paying, to the Commission, not Gulf Coast, a $100 application fee, and, annually thereafter, a $75 renewal fee, to the Commission, not Gulf Coast, for a Public Vehicle Driver's license, pursuant to PTC Rule 1-17.001(h) and (i), (2). As a matter of law, investments of this magnitude mitigate in favor of finding independent contractor status. See, e.g., Associated Diamond, 702 F.2d at 920 (finding taxi lease payments of $30 a day mitigated in favor of independent contractor status because they totaled an "investment of several thousand dollars over the course of a year").

### 4. The Plaintiffs' line of work required special skill.

Courts have found that operating a taxicab requires skill where, as here, the drivers must (1) obtain a driver's license and municipal public vehicle license, (2) know and follow municipal regulations, (3) exercise initiative and discretion in choosing which dispatched calls to accept, and (4) use experience to select routes. See Arena, 3 F. Supp. 3d at 12 (citing Leach v. Kaykov, No. 07-CV-4060-KAM-VVP, 2011 WL 1240022, at *19 (E.D.N.Y. Mar. 30,

---

[7] This calculation assumes the Plaintiffs took no vacations and made weekly payments, as opposed to daily payments, since the weekly rate was cheaper. (Ex. 1 at Ex. A, Schedule A; Ex. B, Schedule A) (indicating taxicab drivers—except for those on "discounted new driver 'orientation status'"—generally paid $560 a week or $98 a day, with each seventh day free).

2011)).

**5. The Plaintiffs' relationship with Gulf Coast was not necessarily of long duration.**

It is uncontested that the Plaintiffs engaged with Gulf Coast on a short-term basis. As discussed above, they had discretion to set their own schedule and paid Gulf Coast for its services in increments of a week, a day, or twelve hours at a time. (Ex. 1 at Ex. A, Schedule A; Ex. B, Schedule A). When that period expired, drivers were under no obligation to engage further with Gulf Coast. See Arena, 3 F. Supp. at 12, 13 (finding similar facts favored independent contractor status for taxicab driver).

**6. The Plaintiffs were not an integral part of Gulf Coast's business and, even if they were, that fact is irrelevant.**

The Plaintiffs allege that they were "integral and essential to the business performed by Defendant" because the Defendant is "a taxicab company, and would not be able to deliver the services that it advertises without . . . employing taxicab drivers." (Dkt. 6, ¶¶ 29, 30). This argument fails because it misstates the nature of Gulf Coast's business. Gulf Coast is not in the business of transporting passengers; rather, it is in the business of operating public vehicles through its renting taxicabs and related services, to taxicab drivers. It is the drivers, not Gulf Coast, who provide taxicab service to the public using equipment based on rental from Gulf Coast and have a legal duty to transport passengers in Hillsborough County. See PTC Rule 1-6.001(2). Gulf Coast does not receive payment from passengers, only from drivers. In this arrangement, the taxicab drivers, not the general public, are Gulf Coast's consumers.

Even if this Court finds that Gulf Coast was in the business of transporting passengers, the Plaintiffs were not integral to Gulf Coast's business because Gulf Coast, at any given time,

contracts with hundreds of taxicab drivers. (Dkt. 29, ¶ 3). If a "[driver] did not show up to drive, or did not take a dispatched call, other drivers stepped in to take those fares and transport those passengers." See Arena, 3 F. Supp. at 13 (finding that fact weighed against employee status). In any event, the Eleventh Circuit held that it is "irrelevant" whether taxicab drivers are integral to companies like Gulf Coast, reasoning that it would "prove[] nothing . . . as it is also true in many relationships which are undisputedly that of a company to independent contractors." Associated Diamond, 702 F.2d at 924; see also FedEx Home Delivery v. N.L.R.B., 563 F.3d 492, 502 (D.C. Cir. 2009) ("[T]he essential nature of a worker's role . . . is not determinative in the face of more compelling countervailing factors . . . . otherwise [delivery] companies . . . could never hire delivery drivers who are independent contractors, a consequence contrary to precedent." (internal alterations and citations omitted). Indeed, "an interdependent relationship [between contractor and contractee], in and of itself, [does not] establish control sufficient to show an employer/employee relationship." See, e.g., Florida Gulf Coast Symphony, Inc. v. Dep't of Labor & Employment Sec., 386 So. 2d 259, 263 (Fla. 2d DCA 1980) (finding musicians were independent contractors of the symphony orchestra for which they performed).

### C.  The Plaintiffs are not entitled to relief under FDUTPA.

The Plaintiffs are not entitled to relief under FDUTPA because there was no deception or unfair competitive advantage, and the Plaintiffs did not suffer cognizable damages.

#### 1.  There was no deceptive act or unfair trade practice because the Plaintiffs were independent contractors.

A FDUTPA plaintiff must establish: "(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." Baptist Hosp., Inc. v. Baker, 84 So. 3d 1200, 1204 (Fla.

1st DCA 2012) (internal citations omitted); see also Fla. Stat. § 501.204(1) (2016). In the instant case, the Plaintiffs cannot recover under FDUTPA because, as argued above, they were not employees of Gulf Coast.[8] They were not misclassified. Conspicuously, none of the declarations submitted by the Plaintiffs claim deception. (Dkt. 17-4); (Dkt. 17-5); (Dkt. 21); (Dkt. 29 at 19-21). The Plaintiffs entered into an agreement with Gulf Coast for the use of appropriately outfitted taxicabs and other services and that is precisely the relationship that ensued between the parties. Gulf Coast never promised compensation. Because the Agreements "would [not] deceive an objectively reasonable observer" as to his or her independent contractor status, they did not cause the Plaintiffs to suffer FDUTPA damages. See Carriuolo v. Gen. Motors Co., No. 15-14442, 2016 WL 2870025, at *4–5 (11th Cir. May 17, 2016). The Plaintiffs allege that they were "'consumers' as defined by [FDUTPA]," (Dkt. 6, ¶¶ 19, 156), and indeed, they were. They were consumers of the services provided by Gulf Coast and therefore are not entitled to wages.

Admittedly, the Court found that even if there was no deception, the Plaintiffs can attempt to show a FDUTPA violation by demonstrating "that Defendant's misclassification of them as independent contractors resulted in substantial cost savings to Defendant (due to its not having to pay employment taxes) and gave Defendant an unfair competitive advantage as a taxicab company

---

[8] The Plaintiffs' theory under FDUTPA is that Gulf Coast deceived them or committed an unfair trade practice by misclassifying them as employees under federal law, namely the FLSA. It does not seem that the Plaintiffs, for FDUTPA purposes, also allege that they were employees under Florida law, but the result would be no different if they do. Under Florida law, independent contractor status is assessed according to the common law of agency as set forth in the Restatement (Second) of Agency Section 220(2). Carroll v. Lowes Home Centers, Inc., No. 12-23996-CIV, 2014 WL 1928669, at *6 (S.D. Fla. May 6, 2014) (citing Cantor v. Cochran, 184 So. 2d 173 (Fla. 1966)). Courts have held that these common-law factors define the notion of "independent contractor" more expansively than the FLSA does. See Barfield v. New York City Health & Hosps. Corp., 537 F.3d 132, 141 (2d Cir. 2008) (citing Rutherford Food Corp. v. McComb, 331 U.S. 722, 729 (1947)). Accordingly, because the Plaintiffs were independent contractors under the FLSA, as argued above, it necessarily follows that they were independent contractors under Florida law, as well. Cf. Hilldrup Transfer & Storage of New Smyrna Beach, Inc. v. State, Dep't of Labor & Employment Sec., Div. of Employment, 447 So. 2d 414 (Fla. 5th DCA 1984) (finding under Florida law that movers who rented trucks from a moving company in order to move loads for the company on a commission basis were independent contractors where they controlled the details of their work).

. . . ." (Dkt. 40 at 7). However, there is no evidence or allegation that any competitor in any market is competitively disadvantaged by Gulf Coast's failure to treat the Plaintiffs as employees. To the contrary, the Plaintiffs allege that the small number of companies that compete with Gulf Coast do so through agreements like those to which Gulf Coast is a party. Indeed, the Plaintiffs expressly allege in their amended complaint that because of the limited number of the taxi permits issued in Hillsborough County, Florida, ". . . the *only* realistic option that is available to a person who wishes to work as a taxicab driver . . . is to enter into a 'lease' agreement with Defendant Gulf Coast, *or with one of the few other taxicab companies that competes with Gulf Coast*."[9] (Dkt. 6, p. 70, ¶ 72) (emphasis added). More importantly in the context of standing, which requires actual injury, a violation of FDUPTA which benefitted Gulf Coast's competitive position would not necessarily cause damage to the Plaintiffs. Indeed, if it allowed Gulf Coast to charge less or provide better service, it would be to the Plaintiffs' financial gain.

**2.  The Plaintiffs did not suffer damages cognizable under FDUTPA.**

The Plaintiffs seek FDUTPA damages only in the form of lost wages, undescribed "negative tax implications," loss of their rights to seek workers and unemployment compensation benefits, and a reduction in contributions paid on their behalf for Medicare and Social Security programs. (Dkt. 6, p. 62, ¶ 14(a), (b)). These damages are not cognizable under FDUTPA. Damages under the statute "are generally understood to be out-of-pocket costs incurred to pay for a product or service, not loss of wages." <u>Bishop v. VIP Transp. Grp., LLC</u>, No. 615CV2118ORL22KRS, 2016 WL 1253734, at *3 (M.D. Fla. Mar. 15, 2016) (granting motion to dismiss on that basis); <u>see also</u> <u>Smith v. Wm. Wrigley Jr. Co.</u>, 663 F. Supp. 2d 1336,

---

[9] The agreement which the Plaintiffs signed is not a lease agreement. It is as noted above an agreement which sets forth the terms and conditions on which drivers may purchase services.

1339 (S.D. Fla. 2009) ("As a general rule, the measure of actual damages under [FDUTPA] is the difference in the market value of the *product or service* in the condition in which it was delivered and its market value in the condition in which it should have been delivered." (emphasis added)). Indeed, the undersigned is aware of no case holding that a plaintiff alleging misclassification as an independent contractor could be entitled to lost wages under FDUTPA. Even the case of <u>Seijo v. Casa Salsa, Inc.</u>, which the Court cited in denying Gulf Coast's motion to dismiss, (Dkt. 40 at 10), is not to the contrary. No. 12-60892-CIV, 2013 WL 6184969, at *7 (S.D. Fla. Nov. 25, 2013) (rejecting defendants' argument that employees were not entitled to lost wages under FDUTPA not on the merits but only because the defendant first asserted the argument in a reply brief).

In addition, "negative tax implications," such as a reduction in Medicare and Social Security contributions, cannot be redressed under FDUTPA because "state law claims brought in order to recover taxes resulting from the misclassification of an employee as an independent contractor are preempted by Federal law." <u>Bishop v. VIP Transportation Grp., LLC</u>, No. 615CV2118ORL22KRS, 2016 WL 4435700, at *5 (M.D. Fla. Aug. 2, 2016) (collecting cases), <u>report and recommendation adopted,</u> No. 615CV2118ORL22KRS, 2016 WL 4382694 (M.D. Fla. Aug. 17, 2016). Moreover, the Plaintiffs cannot recover for "loss of their rights to seek workers and unemployment compensation benefits" because there is no evidence or allegation that they in fact would have sought such benefits if they had had the opportunity.

## <u>CONCLUSION</u>

For the foregoing reasons, Gulf Coast respectfully requests this Court render judgment as a matter of law in favor of Gulf Coast.

Respectfully submitted,

/s/ Thomas M. Gonzalez
Thomas M. Gonzalez
Florida Bar No.: 192341
Tristan Reiniers
Florida Bar No. 0119358
Thompson, Sizemore, Gonzalez, & Hearing, P.A.
201 North Franklin Street, Suite 1600
Tampa, Florida 33602
Telephone: (813) 273-0050
Facsimile: (813) 273-0072
tgonzalez@tsghlaw.com
treiniers@tsghlaw.com
Attorneys for the Defendant

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished

this 3rd day of April, 2017, by CM/ECF electronic filing to the Clerk of Court and by U.S.

Mail to the following:

Estime Francois
3735 Fairview Cove Lane
Apt. 302
Tampa, Florida 33619

Renette Ordeus
937 S. Kirkman Road
Apt. 176
Orlando, Florida 32811

/s/ Thomas M. Gonzalez
Attorney